**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| ATLANTIC NATURAL FOODS, LLC | § | CASE NO. 25-10676 |
| | § | |
| DEBTOR. | § | SECTION A |

**DECLARATION OF J. DOUGLAS HINES IN SUPPORT OF VOLUNTARY PETITION**
**AND FIRST DAY MOTIONS**

I, J. Douglas Hines, being of full age, hereby declare pursuant to 28 U.S.C. § 1746 under penalty of perjury as follows:

1.  I am the Manager and authorized representative Atlantic Natural Foods, LLC (the "Debtor"), the debtor and debtor-in-possession in the above captioned chapter 11 case (the "Case").

2.  On April 7, 2025 (the "Petition Date"), I authorized the Debtor to file its voluntary petition for relief (the "Petition") under chapter 11, subchapter V, of title 11 of the United States Code (the "Bankruptcy Code").

3.  This Declaration is intended to provide the Court and parties-in-interest with an overview of the Debtor's business and the circumstances that precipitated the filing of the Case, as well as to support the factual bases for the First Day Motions. The First Day Motions[1] are

---

[1] The First Day Motions are: (1) *Motion for Entry of an (i) Order Authorizing the Continued Use of (a) Cash Management System and (b) Existing Bank Accounts and Business Forms; and (ii) Granting Related Relief*; (2) *Motion for Entry of an Order (i) Authorizing Debtor to Pay and Honor Pre-Petition Employee Wages, Salaries, Benefits, Benefits, Expenses, and Other Obligations; and (ii) Granting Related Relief*; (3) *Motion for Entry of an Order Pursuant to Bankruptcy Rule 1007(c) Granting Additional Time for Filing Schedules of Assets and Liabilities, Statement of Financial Affairs, and Schedules of Executory Contracts and Unexpired Leases*; (4) *Motion for Entry of an Order (i) for Authority to Continue Pre-Petition Insurance Programs and to Pay Pre-petition Premiums and (ii) Granting Related Relief*; (5) *Motion for Entry of Interim and Final Orders (i) Prohibiting Utilities From Altering, Refusing or Discontinuing Services to, or Discriminating Against the Debtor on Account of Pre-Petition Amounts Due, (ii) Establishing Procedures for Determining Adequate Assurance, and (ii) Granting Related Relief*; (6) *Motion for Entry of an Order (i) Authorizing the Debtor to Pay or Honor Pre-Petition Obligations to Certain Critical Vendors, (ii) Authorizing Banks to Honor all Related Checks and Electronic Payment Requests, and (iii) Granting Related Relief*; and (7) *Motion for Entry of Interim and Final Orders Pursuant (a) Authorizing Use of Cash Collateral and Granting Adequate Protection; and (b) Modifying the Automatic Stay.*

necessary to facilitate an orderly and effective transition into chapter 11 while minimizing disruption to the Debtor's business operations. The Debtor intends to operate its business and manage its assets as a debtor-in-possession pursuant to Section 1107 and 1108 of the Bankruptcy Code.

4. Unless otherwise stated, all facts set forth herein are based on my personal knowledge, my review of relevant business records of the Debtor, information provided to me by the Debtor's employees and professionals, or my experience and knowledge with respect to the operations and financial affairs of the Debtor. If I were called upon as a witness, I would testify competently to the facts set forth in this Declaration.

5. To familiarize the Court and parties-in-interest with the Debtor's business, the relief sought in the First Day Motions, and the Debtor's need for relief through chapter 11 of the Bankruptcy Code, this Declaration is organized in the following sections:

   a. Part I provides an overview of the Debtor's business, including its history, corporate structure, and business operations.

   b. Part II discusses the Debtor's capital structure, including its assets and liabilities.

   c. Part III addresses the events precipitating the Case and the Debtor's goals for the Case.

   d. Part IV provides an overview of the relief requested in the First Day Motions and the bases for such relief.

**I.      THE DEBTOR'S BUSINESS**

6. The Debtor is a producer of plant-based foods with a family of brands that include Loma Linda, TUNO, and Kaffree Roma.

7. The Loma Linda brand dates back to the late nineteenth century and was traditionally associated with the Seventh-day Adventist Church community ("SDA"). Loma Linda products are generally canned meat analog offerings and are sold under the name FriChick,

Choplets, Super-Links, Big Franks, Tender Bits, Chik'n, and others. The original Loma Linda products were created by Dr. John Harvey Kellogg, founder of the Kellogg Company, and came about as the foods produced by the SDA-associated Loma Linda Sanitarium. In 1999, The Kellogg Company acquired the Loma Linda brand which had traditionally been owned by affiliate entities of the SDA Church.

8. Beginning in 2008, the Debtor became a co-manufacturer of Loma Linda products with and for Kellogg. In 2016, the Debtor acquired the Loma Linda brand and all associated rights from Kellogg,

9. Since the Debtor purchased Loma Linda, it conducted extensive production-focused and marketing research and development and completely redesigned the branding to appeal to the modern consumer as well as the very loyal SDA community. The SDA Community for generations has enjoyed Loma Linda products, and the Debtor wanted ensure that the foods they cherished maintained the same standards they had come to expect. At the same time, the Debtor realized it needed to introduce new products, such as TUNO, a plant-based tuna substitute, as well as pouch meals that are fully plant-based and can be heated in a minute or so to be ready-to-eat.

10. The Debtor's products had been based in Nashville, Nash County, North Carolina. However, over approximately the last 18 months, it became evident that the Debtor needed to change where it was producing its products. As such, the Debtor has moved its production outside the U.S. A useful chart showing how the Debtor organizes its product segments, where such products are made, and the number of stock keeping units ("SKUs") are produced within each segment is as follows:

| Product Segment | Country of Origin | Number of SKUs |
|---|---|---|
| Traditional | Philippines | 34 |
| Pouch Meals | Thailand | 21 |
| TUNO | Thailand | 2 |
| Kaffree Roma | Portugal | 1 |
| Neat Balls | Philippines | 3 |

11. As one can see, production is now almost completely taking place in Asia. The reasons that the Debtor felt compelled to off-shore production included: (i) rising costs for raw materials, (ii) rising utilities costs, (iii) decreased production yields, (iv) employee turnover, (v) rising costs of insurance, and other issues including out of stock ingredients, decreased quality, and generally higher prices.

12. The Traditional segment is co-manufactured with Century Pacific Group ("Century"), which is also a very valuable and needed supplier. Century's manufacturing takes place in General Santos City, Philippines, which is a port city well-known for its tuna production. Century is a publicly traded company with strong financial capacity and a solid infrastructure in place for canning, pouch manufacturing, water treatment, and other necessary production. Century has experienced and highly competent management, and it has excellent integrated systems and a global reach for distribution. Century has a diversified portfolio, and its food services already provide shelf stable, frozen, plant-based meat and fish. Notably, their plant-based brand Unmeat has made aggressive inroads world-wide.

13. The Debtor also heavily relies on production in Thailand through Pataya Food Group ("Pataya"). The Pataya facility is located in Mahachai, Thailand, which is a manufacturing area about an hour south of Bangkok. Pataya is also a critical supplier.

14. While the Debtor's production has historically been in North Carolina and/or abroad, its management and operations are directed from the New Orleans, Louisiana area, and its

4

professionals (including legal counsel, accountants, and financial professionals) have traditionally been based in New Orleans.

## II. PRE-PETITION CAPITAL STRUCTURE AND FINANCING

15. The Debtor is a Delaware limited liability company with two members: ANF Holdco, LLC (holding 60.4% of the membership interests of the Debtor) and Above Food USA Corp. ("Above") (holding 39.6% of the membership interests). Above is a subsidiary of Above Food Ingredients, Inc., which is a Saskatchewan, Canada-based company that trades on the NASDAQ under the symbol "ABVE".

16. As of the Petition Date, based in part on the Debtor's most recent unaudited balance sheet through February 28, 2025, the Debtor has total assets worth approximately $19.25 million, and total liabilities of approximately $18 million, inclusive of disputed, unliquidated, and contingent claims. The assets include accounts receivable (approximately $1.3 million), inventory (approximately $6.6 million), fixed assets like plant equipment and computers ($5 million, fully depreciated), and other assets like goodwill and intangibles of $9.6 million. Liabilities include accounts payable ($3.8 million), secured bank debt ($5 million), and long-term liabilities like leases, equipment, and related-party loans of $8.2 million.

17. The Debtor's total secured debt to non-affiliates is approximately $5.8 million. Of this, approximately $650,000 is related to equipment financing or capital leases. The remaining $4.7 million is owed to Comerica Bank ("Comerica").

18. The Comerica debt is based owed under two notes issued under s Credit Agreement dated January 30, 2025: approximately $4.28 million is owed under a Master Revolving Note (the "Revolving Note") with a principal sum of $5 million, and approximately $410,000 is owed under an Installment Note with a principal amount of $480,000 and a maturity of July 31, 2025. Certain other agreements with Comerica memorialize the lending/borrowing relationship between it and

5

the Debtor including an advance formula agreement, a guaranty from myself, and a security agreement (described in more detail below) (collectively all such agreements, notes, and credit agreement being the "Loan Documents").

19. The indebtedness under the Loan Documents is secured by a lien granted through a Security Agreement dated August 30, 2022 (the "Security Agreement"). The lien and security interest attached to substantially all of the assets of the Debtor, including accounts receivable and cash.

20. Under the Loan Documents, Comerica would sweep the Debtor's operating account as cash was received. For context, there have been at least 38 sweeps aggregating to over $1.5 million since January 1, 2025.

21. Comerica sent a notice of default to the Debtor on April 2, 2025, accelerating all obligations and demanding immediate payment of the same. The stated defaults[2] were because:

   a. Borrower is out of formula;

   b. Borrower has submitted inaccurate borrower base reports;

   c. Borrower has submitted inaccurate financial statements;

   d. Borrower granted one or more junior liens on the Collateral; and

   e. Borrower has incurred additional indebtedness.

22. Comerica, in exchange for an offer of forbearance through July 2025, also recently received security interests in trademarks of the Debtor.

### III. EVENTS PRECIPITATING FILING AND GOALS IN CHAPTER 11

23. As discussed above, the Debtor has just recently completed its long-planned move of its production. This has been a major undertaking, and during this operation and trying to

---

[2] These stated defaults are for information only, and not a concession that the Debtor is in default under the Loan Documents.

maintain its business, the Debtor was subject to all of the business stresses that it described herein (namely rising costs and supply chain issues).

24. Additionally, as accounts receivable are collected, these amounts have been swept by Comerica, which sends vital cash to the service of the Comerica indebtedness rather than being available for operating costs.

25. Despite these pressures, the Debtor is optimistic that chapter 11 can offer it some breathing room at a critical time where production is now fully in place in the new facilities. With lower operating costs and new-found stability, the Debtor projects that it will grow cash through the case (described in more detail in the Cash Collateral Motion section of this Declaration).

26. Also, the Debtor has been in negotiations with Century regarding a sale of its assets. Century is the natural and ideal buyer for the business, and the Debtor believes that chapter 11 provides an appropriate forum to steady the business, grow cash, maintain and preserve the assets, and then execute a sale that will pay down the secured debt and provide a meaningful distribution to trade and other unsecured creditors.

27. In sum, the Debtor has suffered from typical, yet serious, business pressures of rising costs which led to issues servicing its debt. This has led to a diversion of its accounts receivable to Comerica as the Debtor was completing a major relocation of production. Its costs will be manageable now with the move complete, and it should be able to maintain its business and earn cash while working toward a sale. If a sale is not possible, then reorganization should be achievable as costs are projected to continue to fall with the new production facilities going forward.

**IV.     FIRST DAY MOTIONS**

28.     To minimize the adverse effects of the commencement of this Case on the Debtor's ability to transition into and ultimately successfully emerge from bankruptcy, the Debtor has filed certain First Day Motions designed to facilitate a smooth transition into chapter 11.

29.     I have reviewed each of the First Day Motions with the Debtor's attorneys, and the facts stated therein are true and correct to the best of my knowledge, information and belief. I believe that the relief sought in each First Day Motion is tailored to meet the goals described above and is in the best interest of the Debtor's estate and creditors. I hereby adopt and affirm the factual representations contained in each of the First Day Motions.

30.     I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in pertinent part, that the Court will not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm." Cognizant of this requirement, the Debtor has narrowly tailored its requests for immediate authority to instances where failure to pay such claims would cause irreparable harm to itself and its estate.

31.     Accordingly, the Debtor requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in preserving the value of the Debtor's estate for the benefit of all parties-in-interest.

**A.     Motion for Entry of an (i) Order Authorizing the Continued Use of (a) Cash Management System and (b) Existing Bank Accounts and Business Forms; and (ii) Granting Related Relief (the "Cash Management Motion")**

32.     The Debtor maintains a cash management system as part of the ordinary course of its business that allows the Debtor to efficiently collect, transfer, and disburse funds, and to fund its weekly payroll (the "Cash Management System"). The Cash Management System is centralized and integrated within Debtor's Enterprise Resource Planning (ERP) platform,

8

NetSuite. It governs both incoming and outgoing cash flows, supporting operational efficiency, financial accuracy, and regulatory compliance.

33. The Cash Management System and ERP platform in which it is an integrated part are necessary for (i) the receipts process (receiving, processing, shipping orders and collecting receipts thereon) and depositing funds into the operating account; and (ii) the disbursement process (purchasing, paying bills, approving expenses, making payments) and proper accounting and recording for disbursements.

34. Post-petition, the Debtor proposes to retain its current Cash Management System (the "Cash Management System"). The Debtor will maintain its books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date. Accordingly, the Debtor will be able to accurately document, record, and track the transactions occurring within the Cash Management System for the benefit of its bankruptcy estates and all parties in interest.

35. Prior to the Petition Date, the Debtor maintained the following bank accounts (the "Bank Accounts"):

| Bank | Account Number (last 4) | Description or Purpose |
|---|---|---|
| Comerica Bank | -1233 | Operating; sweep account (by Comerica) |
| Comerica Bank | -1241 | Checking (non-operational) |

36. It is imperative for the Debtor to maintain its Bank Accounts and Cash Management System in order to manage its payroll, facilitate its projects, and monitor expenses that occur in the ordinary course of business. As a matter of convenience and internal control, it is important for the Debtor to continue to operate its business without disrupting the status quo as it navigates through the early stages of this Case. The Bank Accounts are maintained at institutions insured by

the Federal Deposit Insurance Corporation ("FDIC") and are essential for the Debtor's continued use of the Cash Management System.

37. The Debtor also has a Comerica credit card that it seeks authority to continue to use, and doing so would alleviate an administrative and financial burden on the Debtor at this time in the Case.

38. Additionally, to minimize expenses to its estate and avoid confusion on the part of employees, customers, vendors, and subcontractors, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders, and invoices (collectively, the "Business Forms")) as such forms were in existence immediately before the Petition Date. With such authorization, the Debtor will be able to avoid the expense and delay of ordering entirely new business forms and the significant disruption to the Debtor that such delay will cause.

**B. Motion for Entry of an Order (i) Authorizing Debtor to Pay and Honor Pre-Petition Employee Wages, Salaries, Benefits, Benefits, Expenses, and Other Obligations; and (ii) Granting Related Relief (the "Wages Motion")**

39. As of the Petition Date, the Debtor employed nine employees and retained two independent contractors (collectively the "Employees"). The Debtor pays Employees in the ordinary course of business on weekly basis, in arrears. The Debtor's total payroll for salaries and wages per pay period is approximately $30,000 (including employer-paid payroll taxes). The last payroll date for the Debtor's Employees was on April 4, 2025, which covered the weekly period through March 28, 2025. The Debtor's first post-petition payroll is scheduled to be paid to Employees on April 11, 2025. Consequently, of the Debtor's next payroll, approximately $27,500 is expected to be in respect of prepetition wages. To the extent such amounts for compensation for the next payroll are related to prepetition periods, such amounts are all well within the cap for priority wage claims pursuant to Section 507(a)(4) because no single Employee is owed more than

$3,000. Up to approximately $2,500 will be due in payroll taxes for the pre-petition payroll and the next regular payroll, some of which will relate to pre-petition wages. It is imperative that the Debtor be able to pay wages and payroll taxes that relate to the pre-petition payroll and then continue to do so post-petition in the ordinary course of business.

40. In the absence of a court order granting the relief requested herein, the Debtor will be prohibited from delivering payments or other benefits to the employees (collectively, the foregoing enumerated items are the "Employee Obligations"), and the checks, wire transfers, and direct deposit transfers issued with respect to the prepetition Employee Obligations may be dishonored. If the relief requested herein is not granted, the Debtor's Employees may suffer great hardship and, in many instances, financial difficulties, given that these monies are needed to enable them to meet their own personal obligations. To maintain Employee morale and to minimize personnel attrition due to any hardship that the Debtor's Employees and their dependents may experience if the Employee Obligations are not paid when due, the Debtor seeks authority to honor, in its discretion, the Employee Obligations.

41. Additionally, the Debtor's Employees are vital to the Debtor's continuing operations and the ultimate ability of the Debtor to reorganize in this Case. The Debtor is reliant on its Employees' skills, knowledge and understanding of the Debtor's business and operations to sustain the Debtor during this critical time. The work performed by the Debtor's Employees requires a specialized set of skills and knowledge. Therefore, the Debtor believes it is in its best interest and the best interest of its estate to continue to utilize those employees who are the most equipped to perform for the Debtor during the course of the Case. By ensuring the Debtor can continue to pay the Employee Obligations, such action will eliminate, or at least minimize, employee turnover during this critical time in the Debtor's operations.

42. If the Debtor suffers a decline in its workforce, which is likely if the Debtor is not authorized to provide the relief sought in the Wages Motion, it will cause irreparable harm and have a deleterious impact on the Debtor's estate and its creditors. The Debtor simply cannot afford a reduction to its employee base. Accordingly, the Debtor requests authorization to honor, in its discretion, the Employee Obligations, without interruption, to encourage the employees to remain employed while the Debtor proceeds in bankruptcy.

43. The Employee Obligations are less than the statutory maximum set forth under Section 507(a)(4) and (5) and would have to be paid in full under any plan submitted to the Court. Rather than make Employees wait to receive what is owed in respect of prepetition Employee Obligations, the Court should authorize the Debtor to pay those amounts currently and in the ordinary course of business.

C. **Motion for Entry of an Order Pursuant to Bankruptcy Rule 1007(c) Granting Additional Time for Filing Schedules of Assets and Liabilities, Statement of Financial Affairs, and Schedules of Executory Contracts and Unexpired Leases (the "<u>Extension Motion</u>")**

44. Although the Debtor has commenced the extensive process of gathering the necessary information to prepare and finalize its schedules and statement of financial affairs (the "<u>Schedules and Statements</u>"), the 14-day time period provided by Rule 1007(c) likely will be insufficient for the Debtor to complete the Schedules and Statements given the speed at which the Debtor was forced to file its petition and the attention that it and its professionals must dedicate to other aspects of the Case and the Debtor's needs.

45. As described herein, the Debtor has slashed its workforce and its operating with a skeleton crew. Also, the Debtor has not yet filed papers to retain its professionals, including accountants or bookkeepers, who can ensure that the Schedules and Statements are compliant with the Bankruptcy Code, Bankruptcy Rules, and the U.S. Trustee's Operating Guidelines.

12

46. The Debtor recognizes that its Schedules and Statements must provide complete and accurate information. Furthermore, the Schedules and Statements must provide complete and accurate information and evidence the financial condition of the Debtor as of the Petition Date. In order to prepare the Schedules and Statements as required by Section 521 and Rule 1007(b), the Debtor must gather information from books, records and documents relating to a multitude of parties, transactions, and contracts. Consequently, collection of the information requires an expenditure of substantial time and effort on the part of the Debtor's employees. Given the substantial amount of work required to compile the Schedules and Statements, along with the additional tasks inherent upon filing a chapter 11 case, the Debtor will not be in a position to prepare the Schedules and Statements within 14 days. Therefore, the Extension Motion seeks the Court's authorization to file its Schedules and Statements by thirty (30) days after the commencement of the Case. I believe such an extension is warranted in light of the above and the circumstances of this Case.

**D.     Motion for Entry of an Order (i) for Authority to Continue Pre-Petition Insurance Programs and to Pay Pre-petition Premiums and (ii) Granting Related Relief (the "Insurance Motion")**

47. The Debtor maintains various insurance policies through several different insurance carriers (the "Insurance Carriers") in connection with the Debtor's business. Collectively, these policies provide coverage (as renewed, amended, modified, endorsed, and/or supplemented from time to time) for, among other things: (a) General Liability, (b) Commercial Property, (c) Equipment, (d) Transportation, (e) Workers' Compensation, and (f) Umbrella coverage. A schedule of Insurance Policies is attached hereto as Exhibit A to the Insurance Motion and incorporated herein by reference.

48. The Debtor maintains the Insurance Policies to help manage and limit the risks associated with operating its business. Continuation of the Insurance Policies is essential to the preservation of the value of the Debtor's business, properties and assets. Moreover, in certain

cases, coverage provided by the Insurance Policies is required by laws, regulations, and contracts that govern the Debtor's commercial activities.

49. Certain of the Debtor's Insurance Policies require payment of premiums monthly, and several premiums for pre-petition periods are overdue. It is critical that the Debtor be authorized to pay premiums that were due prior to the Petition Date so that coverage will not lapse during the Case. The Debtor must carry the necessary insurance coverage to operate its business.

50. The terms of all of the Insurance Policies run through November 15, 2025, except (i) the Workers Compensation Insurance Policy, which runs through September 1, 2025, and (ii) the Transportation Insurance Policy, which runs through March 6, 2026. To the extent that the Debtor may seek extensions of coverage, renewals of the Insurance Policies, or obtain additional or different coverage, the Debtor seeks the authority to renew, modify, extend or enter into new Insurance Policies on a post-petition basis in the ordinary course of business.

51. The Debtor needs the ability to pay certain arrears and then carry insurance going forward in the ordinary course of business to preserve its assets and estate. If continued coverage is lost, then the case may be dismissed, or any sale could fall apart due to exposure to unnecessary liability.

**E.** **Motion for Entry of Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against the Debtor on Account of Pre-Petition Amounts Due, (ii) Establishing Procedures for Determining Adequate Assurance, and (ii) Granting Related Relief (the "<u>Utilities Motion</u>")**

52. The Debtor currently uses (or has accounts to use) electric, natural gas, heat, water, sewer, telephone, internet and other similar services provided by multiple providers (the "<u>Utility Companies</u>"), including such Utility Companies identified on Exhibit A attached to the Utilities Motion (the "<u>Utility Service List</u>").

53. The Utility Service List includes accounts for service to the Debtor's Nash County, North Carolina facility (the "Nash County Facility"). As described herein, the Debtor has shifted its operations from the Nash County Facility primarily to facilities in the Philippines and Thailand. As such, most services there may not be provided. However, the lease is still effective and the Debtor needs to maintain the Nash County Facility in a state of some readiness. Therefore, while the Debtor may not continue service after some point in the Case, it remains imperative that the Utility Companies do not cut off service as this could have deleterious effect on the property, plant, and equipment and expose the Debtor to further and unnecessary liability to the landlord. The Debtor should be granted the authority to make critical payments if needed to avoid cutoffs of service.

54. Additionally, the Utilities Motion seeks authority to entertain requests from Utility Companies for Adequate Assurance. The Debtor believes the Utility Companies have adequate assurance of continued payment because the Debtor proposes to pay the most recent month of payments, and to pay what is owed as an administrative expense.

**F.     Motion for Entry of an Order (i) Authorizing the Debtor to Pay or Honor Pre-Petition Obligations to Certain Critical Vendors, (ii) Authorizing Banks to Honor all Related Checks and Electronic Payment Requests, and (iii) Granting Related Relief (the "Critical Vendors Motion")**

55. As of the Petition Date, the Debtor assessed its business relationship with its vendors, particularly the vendors who provide important products that cannot be sourced from other or competing vendors.

56. Prior to and since the Petition Date, the Debtor has worked quickly to assess its vendors with possible outstanding claims and determine which vendors are necessary to the success of the Debtor's operations (collectively, the "Critical Vendors" and as set forth on Exhibit

15

A to the Critical Vendors Motion) in connection with this Case. The Debtor considered the following factors to determine who is a Critical Vendor:

    a. whether a vendor could claim a lien;

    b. whether a vendor is essential to the continued operation of the Debtor's business;

    c. whether a vendor is replaceable without significant disruption to the Debtor's operations;

    d. whether a vendor is entitled to a claim under Bankruptcy Code section 503(b)(9); and

    e. whether a vendor is likely to continue doing business with the Debtor notwithstanding nonpayment of prepetition claims.

57. The Debtor relies in the ordinary course of business on the Critical Vendors to supply goods, materials and services without which the Debtor's business either could not operate or would operate at significantly reduced profitability.

58. The Debtor contemplates making payments on pre-petition claims of certain Critical Vendors (collectively, the "Critical Vendor Claims") that become payable post-petition in the ordinary course of business as and when they become due. Specifically, the Debtor has a need to pay Critical Vendors who are currently providing goods and services with respect to the Debtor's ongoing production, shipping, distribution, and warehousing. The Debtor seeks permission to make payments on certain pre-petition Critical Vendor Claims in a manner, amount and time that is subject to the Debtor's discretion, subject to the terms and conditions contained in any orders entered by this Court authorizing the use of cash collateral, the borrowing of money pursuant to a DIP loan, and any accompanying approved budgets.

59. The Debtor believes that the payment of the Critical Vendor Claims is vital to its efforts to (i) reorganize its financial affairs in this Case and (ii) preserve and enhance its estate to realize value from any sales of the business or assets. In many cases, the Critical Vendors are the only source, or the most-preferred source, from which the Debtor can procure certain goods and services within a timeframe and at a price that will permit the Debtor to continue to smoothly operate its business. A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtor post-petition and may force the Debtor to attempt to obtain such goods and services elsewhere at a much higher price or in a quantity or quality that is insufficient to satisfy the Debtor's requirements – and there is no guaranty that the Debtor will even be able to replace many of the Critical Vendors.

60. The Debtor intends to apply its sound business judgment and discretion on a case-by-case basis and pay only those Critical Vendor Claims that are: (i) vital to maintaining its operations; and (ii) are willing to provide the Debtor with favorable post-petition terms in accordance with any order granting the relief requested in this Motion. The Debtor believes that, without the ability to pay certain prepetition amounts owed to Critical Vendors, the Debtor's immediate access to necessary goods and services would be extinguished as the Critical Vendors will refuse to continue doing business with the Debtor or may only do business if the Debtor provides trade term accommodations such as advance deposits or payment prior to delivery. Further, as of the filing of this Motion, the Debtor may have already received invoices from certain Critical Vendors who await payment from the Debtor.

61. Subject to the Court's approval, the Debtor intends to pay the Critical Vendor Claims only to the extent necessary to continue its ongoing operations and preserve the value of its estate during the Case. To that end, in return for paying all or a portion of the Critical Vendor

Claims, the Debtor proposes that it be authorized to require the Critical Vendors to provide favorable trade terms for the post-petition procurement of their goods and services.

**G.   Motion for Entry of Interim and Final Orders Pursuant (a) Authorizing Use of Cash Collateral and Granting Adequate Protection; and (b) Modifying the Automatic Stay (the "<u>Cash Collateral Motion</u>")**

62.   The Debtor has an immediate need to use Cash Collateral for the purpose of meeting necessary expenses incurred in the ordinary course of its business, including maintenance, repair, upkeep, utility expenses, maintenance costs, and the costs associated with its restructuring and this proceeding, while it restructures and reorganizes its indebtedness and business in a manner that maximizes value and is fair and equitable to all parties in interest. The Debtor estimates at this time based on the budget attached to the Cash Collateral Motion (the "<u>Budget</u>") that the Debtor's unencumbered cash on hand, the Cash Collateral, and future revenue from continued operations will be sufficient to fund the Debtor's continued operations during the period set forth in the Budget.

63.   Ceasing operations is not in the best interests of any party to this Case, including Comerica, as the Debtor's failure to operate will immediately and irreparably impair (a) the Debtor's extrinsic value and (b) the Debtor's ability to use Cash Collateral to generate cash proceeds in excess of the amount of the Cash Collateral and keep the Debtor operating throughout the Case in order to propose a successful sale or reorganization.

64.   The Budget shows that the Cash Collateral of Comerica will actually increase during the Case. Comerica has consented to the use of Cash Collateral pursuant to the interim order attached to the Cash Collateral Motion (the "<u>Interim Order</u>"), which requires compliance with the Budget within certain reasonable variances and reporting standards. Additionally, the Debtor is providing adequate protection to Comerica through the granting of replacement liens and superpriority claims for any diminution of value of the Cash Collateral, as well as payments

pursuant to the Budget which will manage the indebtedness and mitigate against diminution in value. Finally, a non-debtor entity will provide a mortgage on unencumbered real property in Mandeville, Louisiana.

I certify that the foregoing statements made by me are true to the best of my knowledge, information and belief.

Dated: April 7, 2025  /s/Douglas Hines
J. Douglas Hines